UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
ANTHONY P. DiCHIARA,                    :
                                        :        06 Civ. 3838 (DLC)
                      Plaintiff,        :
                                        :
            -v-                         :        OPINION & ORDER
                                        :        _____
AMPLE FAITH INVESTMENTS LIMITED and     :
OFFER HIGH INVESTMENTS LIMITED,         :
                                        :
                      Defendants.       :
                                        :
----------------------------------------X

Appearances

For plaintiff:
Mark W. Lerner
Noelle Kowalczyk
Jodi I. Horowitz-Vickers
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019

For defendants:
Jack C. Auspitz
Charles E. Tebbe III
John W.R. Murray
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104


DENISE COTE, District Judge:

        Plaintiff Anthony DiChiara ("DiChiara"), an American lawyer

and business executive, brings this action to recover his claimed

3% equity stake in an American eyewear company from defendants

Ample Faith Investments Limited ("Ample Faith") and Offer High

Investments Limited ("Offer High"), who are majority owners of

the company.  DiChiara claims he was issued the stock in

recognition of his service to defendants' parent company, Hong

Kong-based Moulin Global Eyecare Holdings Limited ("Moulin").  He

contends that defendants, who are incorporated in the British
Virgin Islands, have refused to recognize his ownership of the 3%
stake and have attempted to sell it, along with their own stock,
to an outside purchaser.

Invoking this Court's diversity jurisdiction, DiChiara
brings common law tort claims and seeks a declaration that he is
the rightful owner of the 3% equity stake; an injunction
prohibiting defendants from distributing any proceeds from the
sale of the stock; and damages.  Defendants move to dismiss the
complaint, arguing that (1) the Court lacks personal jurisdiction
over defendants; (2) the "first filed" rule and the doctrines of
forum non conveniens and comity require that the issues be
litigated in Hong Kong; and (3) DiChiara's failure to join
Moulin, an indispensable party, requires dismissal of the action.
For the following reasons, defendants' motion is denied.


Background

The following facts are taken from the pleadings and the
parties' submissions on the instant motion.  They are undisputed
except where otherwise noted.

In late 1999 or early 2000, DiChiara was engaged by Moulin,
an optical products company, to serve as an outside consultant.
Over the next few years, DiChiara played a substantial role in a
number of Moulin's investment and acquisition efforts.

On November 12, 2004, DiChiara entered into a Term Sheet
Agreement (the "Term Sheet") with Moulin's then-CEO, Cary Ma
("Ma"), under which he agreed to serve as Moulin's general
counsel, chief administrative officer, and executive vice

president of strategic planning.  DiChiara was also to be
appointed an executive director of Moulin the following year.  In
addition to an annual base salary of $375,000, the Term Sheet
promised DiChiara a substantial bonus if Moulin's efforts to
acquire the Eye Care Centers of America ("ECCA") were successful.
Although the Term Sheet provided that DiChiara and Moulin would
negotiate a "definitive employment agreement" by December 31,
2004, there is no indication that such an agreement was ever
reached.  And, according to defendants, Moulin's board never
approved the compensation package outlined in the Term Sheet.

    Moulin planned to acquire ECCA through use of an investment
vehicle -- ECCA Holdings Corporation ("ECCA Holdings") -- which
was to be owned 56.5% by Moulin,[1] 42.5% by Golden Gate Private
Equity ("Golden Gate"), and 1% by members of ECCA management.
According to the Term Sheet, once the acquisition had closed,
DiChiara would receive a $1.25 million payment and a stock option
grant to purchase 3% of the common shares of ECCA Holdings at a
90% discount to fair market value.  Under the agreement between
DiChiara and Ma, then, Moulin's intended stake in ECCA Holdings
would be reduced to 53.5%.

    On February 2, 2005, Ample Faith, Golden Gate, and ECCA
Holdings executed a Stockholders Agreement (the "Stockholders
Agreement"), that, among other things, laid out the conditions
for the transfer and registration of stock, and established the
composition and voting procedures of the board of directors.  The

---

[1] Moulin, however, did not intend to own the shares
directly.  Instead, Ample Faith -- an indirect wholly owned
subsidiary of Moulin -- was to acquire and hold the 56.5% equity
stake in ECCA Holdings.

parties to the Stockholders Agreement also agreed to the
application of New York law and the non-exclusive jurisdiction of
New York courts over disputes pertaining to the agreement:

> THE INTERPRETATION AND CONSTRUCTION OF THIS AGREEMENT,
> AND ALL MATERS RELATING HERETO, SHALL BE GOVERNED BY
> THE LAWS OF THE STATE OF NEW YORK. . . .
>
> Each of the Parties hereby irrevocably acknowledges and
> consents that any legal action or proceeding brought
> with respect to any of the obligations arising under or
> relating to this Agreement may be brought in the courts
> of the State of New York, County of New York or in the
> United States District Court for the Southern District
> of New York and each of the Parties hereby irrevocably
> submits to and accepts with regard to any such action
> or proceeding . . . the non-exclusive jurisdiction of
> the aforesaid courts.

DiChiara claims he later became a party to the Stockholders
Agreement by executing a joinder.

The ECCA acquisition closed on March 1, and DiChiara became
president of ECCA Holdings and was named to its board of
directors.  Some time thereafter, DiChiara and Ma executed a
Stock Purchase Agreement (the "SPA"), which purported to grant
DiChiara 3% of the stock in ECCA Holdings, or 49,387 Series B
Participating Preferred shares.[2]  In contrast to the Term Sheet,
the SPA did not require DiChiara to purchase the shares.
Instead, they were granted to him outright; the only
consideration for the stock was DiChiara's "past service to the
Company."  At the time of the SPA, according to defendants, a 3%
stake in ECCA Holdings was worth slightly more than $5 million.

On April 1, Moulin's auditors, Deloitte Touche Tomatsu
("Deloitte"), suspended its audit of the company's books from the

---

[2] Although the SPA is dated "as of March 25, 2005," it
appears that it was not executed until at least April 10.

previous year.  Deloitte submitted a letter to Moulin's board of directors complaining that it had not been given sufficient access to records, and raising "questions as to the validity of transactions" recorded by Moulin and whether Moulin had "proper internal controls."  On the same day, Moulin wired DiChiara just over $1 million, which purportedly represented a portion of his cash bonus, as well as outstanding fees and expenses.[3]  On April 18, Deloitte formally resigned, and Moulin suspended trading of its shares on the Hong Kong Stock Exchange.

Moulin's bank creditors hired an auditor to review the company's books.  By June, the audit had revealed widespread financial and accounting irregularities in Moulin's financial statements stretching as far back as 2000.  As a result of these misstatements, Moulin's true debt load had been hidden from the financial markets.  A group of banks initiated a "winding up" proceeding -- the equivalent of a bankruptcy action -- in Hong Kong's High Court.  They also petitioned the court for a provisional liquidation order against Moulin.  The order was issued, and Roderick Sutton ("Sutton") and Desmond Chiong ("Chiong") of Ferrier Hodgson Limited ("Ferrier Hodgson") were appointed provisional liquidators.  They took control of Moulin and its subsidiaries -- including the defendants in this action-- and Sutton replaced Ma on the board of directors of ECCA Holdings.[4]  Ma and at least four other Moulin employees were

---

[3] Defendants claim that the $1 million came from a fraudulently obtained loan based on a falsified invoice printed on the letterhead of DiChiara's consulting firm.

[4] A winding up proceeding was also initiated in Bermuda, where Moulin is incorporated.  That proceeding is not at issue

later arrested in Hong Kong amid allegations of fraud.

On May 19, DiChiara attended the first meeting of ECCA Holding's board of directors, which was held in Napa, California. According to DiChiara, several dozen stock certificates were issued at the meeting, including Certificates Nos. 1 and 2 in the name of Ample Faith, and Certificate No. 3 -- representing a 3% share in ECCA Holdings -- in the name of DiChiara.  DiChiara contends that White & Case LLP ("White & Case"), a law firm that represented Moulin, then collected the executed certificates and transported them elsewhere for safekeeping.  Defendants, however, argue that no stock certificates were delivered to shareholders at the meeting.  Instead, according to defendants, DiChiara was informed at the meeting that his certificate could not be issued until Ample Faith endorsed its certificate to reflect the transfer of part of its ownership to him.

In early September 2005, Sutton contacted DiChiara to inform him that he did not intend to recognize DiChiara's purported 3% ownership of ECCA Holdings.  Sutton told DiChiara that Moulin had not possessed the authority to transfer him any shares in ECCA Holdings, since Ample Faith, not Moulin, was the true owner of the 56.5% stake.[5]

---

here.

[5] According to DiChiara, this represented a radical about-face for Sutton, who had repeatedly acknowledged DiChiara's status as a shareholder of the company during his first months on the board.  DiChiara's purported ownership stake in ECCA Holdings had also previously been disclosed to Moulin's shareholders through a February 2005 circular regarding the then-proposed acquisition of ECCA, in which Moulin stated that it would own 53% of ECCA Holdings through Ample Faith, while a "member of senior management" would own an additional 3%.  Additionally, in at least four filings with the SEC during 2005, ECCA noted that

On September 15, DiChiara was removed from the ECCA Holdings board of directors, and, at Sutton's direction, Certificate No. 3 was marked "cancelled." DiChiara's seat on the board was filled by Chiong. Although DiChiara made multiple requests for the return of his original stock certificate, he claims he was rebuffed by Sutton and Chiong's lawyers. On November 17, Sutton wrote to DiChiara to inform him that his certificate had been cancelled, and that the entire 56.5% equity stake in the company had been transferred to Ample Faith's wholly owned subsidiary Offer High.

Beginning in January 2006, Moulin undertook efforts to sell its purported 56.5% interest in ECCA Holdings to a third party. On May 1, Moulin announced that ECCA would be sold to Highmark, Inc. for $602 million. The transaction, which was scheduled to close in the third quarter of 2006, was approved by the board of directors of ECCA Holdings.

On April 20, 2006, Moulin, acting through its liquidators, initiated an action against DiChiara in the Hong Kong High Court, seeking, among other things, a declaration that the Term Sheet and the SPA are "void; voidable ...; and/or [are] of no legal effect." DiChiara was served with a writ of summons in the action at his New Jersey residence on May 19. He has appeared in the action and indicated that he will contest it.

On May 19, DiChiara filed this action against Ample Faith and Offer High, alleging that they had wrongly cancelled

---

Moulin had "granted one of its senior executives restricted stock comprising 3% of the total outstanding equity of ECCA Holdings, which reduced Moulin's ownership ... to 53%."

Certificate No. 3 and thereby appropriated his ownership stake in
ECCA Holdings.[6]  He brings claims for breach of fiduciary duty
based on defendants' obligations to minority shareholders, common
law unjust enrichment, and common law conversion.  Defendants now
move to dismiss the complaint.


Discussion

I. Personal Jurisdiction

     It is well established that on a motion to dismiss for lack
of personal jurisdiction, the "plaintiff bears the burden of
showing that the court has jurisdiction over the defendant."  In
re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d
Cir. 2003) (per curiam).  Where there has been no discovery, the
plaintiff need only make "legally sufficient allegations of
jurisdiction" through its pleading and affidavits in order to
survive a motion to dismiss.  Id.

     Here, it is undisputed that defendants do not do business in
New York and are incorporated in the British Virgin Islands.  The
sole alleged basis for personal jurisdiction over defendants,

---

     [6] On the same date, DiChiara also filed a complaint in the
Delaware Court of Chancery against ECCA Holdings and five members
of its board of directors, including Sutton and Chiang (the
"Delaware action").  In the Delaware action, DiChiara made
numerous factual allegations and brought many claims that are
nearly identical to those contained in the complaint in this
action.  In addition, in December 2005, DiChiara had filed a
similar case in California state court (the "California action"),
naming Moulin, Ample Faith, Offer High, Sutton, Chiong, and
Ferrier Hodgson as defendants.  The matter was removed to the
United States District Court for the Northern District of
California, and on March 3, 2006, much of the action was stayed
in light of the Hong Kong winding up proceeding.  On May 19 --
the date this action and the Delaware action were filed --
DiChiara voluntarily disimssed the California action.

then, is the Stockholder's Agreement, under which the parties submitted to the jurisdiction of New York courts with respect to "any legal action or proceeding brought with respect to any of the obligations arising under or relating to [the] Agreement."

While it is clear that personal jurisdiction may be conferred through a party's contractual consent, D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 103 (2d Cir. 2006), defendants contend that the Stockholders Agreement is not relevant here, as DiChiara's claims do not "aris[e] under or relat[e] to" that contract.  The Stockholders Agreement, they argue, pertains solely to the management of ECCA Holdings and the relationship among shareholders; it simply does not speak to the validity of DiChiara's claim to a 3% equity stake in the company. According to defendants, the only document that might confer those rights on DiChiara is the SPA -- a contract to which defendants are not parties, and under which all disputes must be brought in California courts.

DiChiara contends that, although he is not making a claim for breach of the Stockholders Agreement, the broad language of the contract's jurisdiction clause does not require him to do so. Rather, it covers all actions that implicate obligations "arising under or relating to" the Stockholders Agreement -- a category expansive enough to include the tort claims pleaded in the complaint here.

The scope of a contractual jurisdiction-conferring provision is a threshold question that must be determined under the law of the forum.  See, e.g., Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc., 414 F.3d 325, 333 (2d Cir. 2005)

(applying this principle to choice-of-law clause).  Courts
applying New York law have had few occasions to construe
jurisdiction-conferring contractual language.[7]  They have,
however, provided some guidance regarding the scope of forum-
selection and choice-of-law clauses.  In those contexts, the
analysis has turned on the precise language used in the contract.
For example, a provision stating that the "contract shall be
governed by the laws of the State of New York" will not be
construed to bind the parties "as to causes of action sounding in
tort."  Id. at 334 (quoting Knieriemen v. Bache Halsey Stuart
Shields Inc., 427 N.Y.S.2d 10, 12 (App. Div. 1980), overruled on
other grounds, Rescildo v. R. H. Macy's, 594 N.Y.S.2d 139 (App.
Div. 1993)).  On the other hand, a clause conferring on English
courts "exclusive jurisdiction to settle any dispute ... arising
out of or relating to" plaintiffs' business with defendants is
interpreted to cover far more than just "allegations of
contractual violations."  Roby v. Corporation of Lloyd's, 996
F.2d 1353, 1359, 1361 (2d Cir. 1993).  See also Bense v.
Interstate Battery System of America, 683 F.2d 718, 720 (2d Cir.
1982) (finding that a forum selection clause applying to "causes
of action arising directly or indirectly" from an agreement
covers federal antitrust actions).

---

[7] Any exercise of personal jurisdiction over the defendants
must also comport with the Due Process Clause.  Grand River
Enterprises Six Nations, Ltd. v. Pryor, 425 F.3d 158, 165 (2d
Cir. 2005).  Although defendants state that "exercise of personal
jurisdiction ... is not permissible under ... the federal Due
Process Clause," they do not identify any basis for this argument
other than their belief that the jurisdictional clause in the
Stockholders Agreement is not implicated by this dispute.

Here, the language of the jurisdiction-conferring clause is of the more expansive variety.  It covers all actions that pertain to "any of the obligations arising under or relating to" the Stockholders Agreement.  DiChiara's claim for breach of fiduciary duty implicates one such obligation.  Indeed, each of DiChiara's claims "relat[es] to" the Stockholders Agreement, since those claims "depend on rights and duties that must be analyzed by reference to the contractual relationship." Direct Mail Prod. Serv. Ltd. v. MBNA Corp., No. 99 Civ. 10550 (SHS), 2000 WL 1277597, at *6 (S.D.N.Y. Sept. 7, 2000).  One could not, after all, evaluate DiChiara's claims of conversion and unjust enrichment without examining his claimed joinder in the Stockholders Agreement, the method and timing of the issuance of shares in the company, and the actions of ECCA Holdings's board of directors.  DiChiara has therefore made legally sufficient allegations of personal jurisdiction over defendants pursuant to the Stockholders Agreement.[8]

II. Forum Non Conveniens

"The principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." Norex Petroleum Ltd. v. Access Industries, Inc.,

---

[8] Defendants' additional argument that the jurisdiction clause is irrelevant because DiChiara is not a party to the Stockholders Agreement is unavailing.  Even if DiChiara's joinder in the Stockholders Agreement were a prerequisite to a finding of jurisdiction -- a proposition that it is unnecessary to reach here -- his claim to have joined it is sufficient at this stage of the litigation.

416 F.3d 146, 153 (2d Cir. 2005) (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947)).  A court may decline jurisdiction when it would "best serve the convenience of the parties and the ends of justice."  Gross v. British Broadcasting Corp., 386 F.3d 224, 229 (2d Cir. 2004) (quoting Koster v. (American) Lumbermens Mut. Cas. Co., 330 U.S. 518, 527 (1947)).  The Second Circuit has outlined a three-step process for district courts to use when determining whether to dismiss an action on the ground of forum non conveniens:

> At step one, a court determines the degree of deference
> properly accorded the plaintiff's choice of forum.  At
> step two, it considers whether the alternative forum
> proposed by the defendants is adequate to adjudicate
> the parties' dispute.  Finally, at step three, a court
> balances the private and public interests implicated in
> the choice of forum.

Norex, 416 F.3d at 153 (citation omitted).


A. DiChiara's Choice of Forum

"[A] plaintiff's choice of forum is presumptively entitled to substantial deference," Gross, 386 F.3d at 230, and "unless the balance is strongly in favor of defendant, the plaintiff's choice of forum should rarely be disturbed." Gilbert, 330 U.S. at 508.  This presumption is strongest when the plaintiff chooses to litigate in his home forum.  Norex, 416 F.3d at 154.  In addition to employing this presumption, courts determine the degree of deference to be accorded a plaintiff's choice of forum based on the extent to which the choice "has been dictated by reasons the law recognizes as valid." Id. (citation omitted). "[T]he more a plaintiff ... chooses to sue in a United States court for legitimate reasons, the more deference must be given to

that choice." Biqio v. Coca-Cola Co., 448 F.3d 176, 179 (2d Cir. 2006) (citation omitted).  The Second Circuit has identified the factors that are relevant to this determination:

> (1) the convenience of the plaintiff's residence in relation to the chosen forum, (2) the availability of witnesses or evidence to the forum district, (3) the defendant's amenability to suit in the forum district, (4) the availability of appropriate legal assistance, and (5) other reasons relating to convenience or expense.  Circumstances generally indicative of forum shopping, that is, plaintiff's pursuit not simply of justice but of justice blended with some harassment, include (1) attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, (2) the habitual generosity of juries in the United States or in the forum district, (3) the plaintiff's popularity or the defendant's unpopularity in the region, or (4) the inconvenience and expense to the defendant resulting from litigation in that forum.

Norex, 416 F.3d at 155 (citation omitted).

Here, the factors weigh strongly in plaintiff's favor. DiChiara lives in New Jersey and brings this case in neighboring New York, where defendants are amenable to suit under the Stockholders Agreement.  Defendants have provided no support for their contention that plaintiff is forum shopping.  They have not argued, much less shown, that New York laws are advantageous to DiChiara, that any of the parties are viewed favorably or unfavorably by New York juries, or that litigating in New York would be particularly expensive for defendants.[9]  The only evidence to which defendants point is that DiChiara previously filed a similar action in California and simultaneously filed one in Delaware.

---

[9] Indeed, given that the defendants agreed to the jurisdiction of the New York courts for disputes relating to the Stockholders Agreement, it appears that they did not believe it to be a prohibitively expensive forum in which to litigate.

DiChiara, however, has provided reasonable explanations for his actions.  Pursuant to a forum selection clause in the SPA, Moulin was amenable to process only in California, where DiChiara initially filed his claims.  That action was stayed as to Moulin, and certain other defendants refused to consent to the jurisdiction of the California courts.  As a result, DiChiara filed this action against Ample Faith and Offer High in New York, owing to the jurisdiction clause of the Stockholders Agreement, and the Delaware action against ECCA Holdings and its directors in Delaware, because ECCA Holdings is organized under the laws of Delaware.  DiChiara's choice of forum will therefore be given substantial deference.


B. The Public and Private Interests

As a result of this deference, defendants bear a heavy burden to demonstrate both that Hong Kong is an adequate alternative forum and that "the ends of justice" -- as measured by the private and public factors enumerated by the Supreme Court -- weigh decisively in favor of dismissing this action.  Gross, 386 F.3d at 232.  Even assuming Hong Kong's High Court could adequately resolve this dispute (an issue that need not be reached here) defendants have not shown "the level of oppressiveness ... required to overturn a U.S. plaintiff's choice of [his] home forum."  Id.

The private interest factors to be weighed in a forum non conveniens analysis include:

> relative ease of access to sources of proof;
> availability of compulsory process for attendance of
> unwilling, and the cost of obtaining attendance of

14

> willing, witnesses; possibility of view of premises, if
> view would be appropriate to the action; and all other
> practical problems that make trial of a case easy,
> expeditious and inexpensive.

Gilbert, 330 U.S. at 508.  Here, defendants argue primarily that
the majority of relevant witnesses -- including the directors of
Moulin, at least one lawyer from White & Case, and Ma -- reside
in Hong Kong or China and cannot be compelled to testify in the
United States.  They also contend that most of the relevant
events -- including the cancellation of DiChiara's claimed stock
certificate and the investigation of Moulin's business practices
-- occurred in Hong Kong, and that the documentary evidence
remains there.

Defendants, however, neglect to take into account that the
first meeting of ECCA Holdings's board of directors, where the
stock certificates were discussed (and perhaps issued), occurred
in the United States.  Furthermore, defendants have not indicated
that the witnesses who reside outside the United States would be
unwilling to testify in an American court.  On the contrary,
there are good reasons to believe they would do so.  First, the
majority of these witnesses appear to be involved in
international business and presumably travel widely.  Second,
many of them are affiliated with entities that submitted to the
jurisdiction of American courts in documents such as the SPA,
Term Sheet, and Stockholders Agreement.  And third, some of these
witnesses have an interest in the outcome of this litigation.
Therefore, the private interests do not weigh heavily enough in
favor of litigating this matter in Hong Kong to overcome
DiChiara's choice of forum.

The same is true of the public interests.  Those factors
include:

> the administrative difficulties flowing from court
> congestion; the local interest in having localized
> controversies decided at home; the interest in having
> the trial of a diversity case in a forum that is at
> home with the law that must govern the action; the
> avoidance of unnecessary problems in conflict of laws,
> or in the application of foreign law; and the
> unfairness of burdening citizens in an unrelated forum
> with jury duty.

Gross, 386 F.3d at 233 (quoting Piper Aircraft Co. v. Reyno,
454 U.S. 235, 241 n.6 (1981)).  Defendants argue primarily that
Hong Kong's interest in the litigation outweighs that of the
United States.  As DiChiara notes, however, the dispute here is
whether a New Jersey resident or foreign corporations have the
right to a 3% ownership stake in a Delaware company.  Even if
Hong Kong's interest in the present litigation is great, the
interest of the United States is sufficient to justify
maintaining jurisdiction over this action.

Defendants' other arguments regarding the public interests
are similarly weak.  The threat of "court congestion" is of
little if any relevance in this circuit, Guidi v.
Inter-Continental Hotels Corp., 224 F.3d 142, 146 n.5 (2d Cir.
2000), and, in any event, defendants have not shown that this
litigation will impose a significant burden on the Court.
Similarly, the possibility that this action will involve the
application of Hong Kong law, standing alone, "is not sufficient
to warrant dismissal."  Piper, 454 U.S. at 260 n.29.

III. Comity

International comity is "the recognition which one nation

allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience." Hilton v. Guyot, 159 U.S. 113, 163-64 (1895).  The doctrine allows -- but does not require -- an American court to dismiss an action in favor of a foreign proceeding or judgment.  Royal and Sun Alliance Ins. Co. of Canada v. Century Int'l Arms Inc., 466 F.3d 88, 92 (2d Cir. 2006).  It is rare that the existence of a foreign action will justify dismissal, since

> parallel proceedings . . . should ordinarily be allowed
> to proceed simultaneously, at least until a judgment is
> reached in one which can be pled as res judicata in the
> other.  The mere existence of parallel foreign
> proceedings does not negate the district courts'
> virtually unflagging obligation to exercise the
> jurisdiction given them.

Id. (citation omitted).  The only context in which a parallel foreign proceeding might require dismissal is bankruptcy, since American courts recognize "[a] foreign nation's interest in the equitable and orderly distribution of a debtor's property."  Id. at 93 (citation omitted).

Here, however, the United States Bankruptcy Court for the Northen District of California ruled that "the total outstanding shares of capital stock of ECCA ... are not property of Moulin or its estate."  In re Moulin Global Eyecare Holdings Ltd., No. 06-30018 (Bankr. N.D. Cal. March 3, 2006) (order re petitioner's motion for order under Chapter 15).  Defendants have provided no reason to call that holding into question or to conclude that the outcome of this litigation will affect Moulin's winding up proceeding in Hong Kong.  Furthermore, defendants have not demonstrated that any of the "exceptional circumstances" that

17

might justify a refusal of jurisdiction outside the bankruptcy context are present here.[10]  Royal and Sun Alliance, 466 F.3d at 93.


IV. Failure to Join Moulin

Rule 12(b)(7), Fed. R. Civ. P., provides that an action may be dismissed for failure to join a party under Rule 19.  The Rule 19 framework was described by this Court in In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288(DLC), 2004 WL 2955237 (S.D.N.Y Dec. 22, 2004).  In brief, Rule 19 sets forth a two-step test for determining whether a court must dismiss an action for failure to join an indispensable party.  Viacom Int'l Inc. v. Kearney, 212 F.3d 721, 724 (2d Cir. 2000).  First, the court must determine whether an absent party is a "necessary" party under Rule 19(a). Id.  Rule 19(a) provides that the absent party should be joined, if feasible, where:

> (1) in the person's absence complete relief cannot be accorded among those already parties or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Rule 19(a), Fed. R. Civ. P.  With respect to the second prong of Rule 19(a), "there must be more than an unsupported assertion that [the non-joined party] has a claim to that interest." Jonesfilm v. Lion Gate Int'l, 299 F.3d 134, 140 (2d Cir. 2002).

---

[10] In any event, defendants appear to have abandoned this argument, as they do not address it in their reply brief.

Where a court makes a threshold determination that a party
is necessary under Rule 19(a) and joinder of the absent party is
not feasible for jurisdictional or other reasons, the court must
then determine whether the party is "indispensable" under Rule
19(b).  <u>Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co.</u>,
312 F.3d 82, 87 (2d Cir. 2002).  Rule 19(b) provides that the
following factors should be considered by the court in making
such a determination:

> first, to what extent a judgment rendered in the
> person's absence might be prejudicial to the person or
> those already parties; second, the extent to which, by
> protective provisions in the judgment, by the shaping
> of relief, or other measures, the prejudice can be
> lessened or avoided; third, whether a judgment rendered
> in the person's absence will be adequate; fourth,
> whether the plaintiff will have an adequate remedy if
> the action is dismissed for nonjoinder.

Rule 19(b), Fed. R. Civ. P.  District courts take a "flexible
approach" when deciding whether parties are indispensable, and
the Second Circuit has held that "very few cases should be
terminated due to the absence of nondiverse parties unless there
has been a reasoned determination that their nonjoinder makes
just resolution of the action impossible."  <u>Universal Reins.</u>, 312
F.3d at 87 (citation omitted).

Moulin is not a necessary party.  First, as defendants
concede, Ample Faith -- through its subsidiary Offer High -- owns
the disputed equity interest in ECCA Holdings.  As a result,
there is no reason that "complete relief" could not be accorded
among the current parties.  Second, Moulin's only claim to the
contested shares comes via its ownership of Ample Faith and Offer
High.  Therefore, as a practical matter, Moulin's interests are
identical to those of defendants here and will be fully protected

by them.  See Prescription Plan Service Corp. v. Franco, 552 F.2d 493, 497 (2d Cir. 1977).  Furthermore, for the same reason, the risk of defendants incurring "inconsistent obligations" is not affected by Moulin's joinder or non-joinder in this action.

Even if Moulin were a necessary party, however, it would not be indispensable.  Defendants' only argument here is that adjudicating the dispute without joining Moulin as a party will prejudice Moulin by preventing it from "contest[ing] the validity of the [SPA and the Term Sheet] in this action."  It is by no means clear that this is the case.  DiChiara's claims do not appear to be primarily based on those agreements, but on his contention that he was issued shares in ECCA Holdings that were later wrongfully cancelled.  Nowhere has he argued that defendants were obligated to honor the SPA or Term Sheet; rather, he contends that, once he became a shareholder, they were obligated to recognize his stake in the company.  Similarly, Ample Faith and Offer High's defense appears to turn not primarily on the construction of the SPA or Term Sheet, but on their contention that DiChiara was never issued a stock certificate in the first place.[11]  Defendants having not shown that Moulin will be prejudiced by the adjudication of this case, Moulin will not be deemed an indispensable party.

---

[11] Moreover, to the extent that the validity of the SPA and Term Sheet is an issue here, defendants will adequately defend Moulin's rights in that regard.  Indeed, defendants have already submitted at least one affidavit in connection with this motion that argues that both agreements are invalid.

V.   The "First Filed" Rule

Finally, defendants argue that the present action should be dismissed pursuant to the "first filed" rule, as it was commenced in May, while Moulin's Hong Kong action against DiChiara was filed in April.  Defendants neglect to note that the rule applies only when the actions at issue are brought in separate <u>federal</u> courts:

> The "first filed" rule states that where an action is brought in one federal district court and a later action embracing the same issue is brought in another federal court, the first court has jurisdiction to enjoin the prosecution of the second action.

<u>City of New York v. Exxon Corp.</u>, 932 F.2d 1020, 1025 (2d Cir. 1991) (citation omitted).  Defendants have pointed to no cases in which this rule has been applied to dismiss a domestic action in favor of a foreign one, and it will not be so applied here.


Conclusion

For the foregoing reasons, defendants' motion to dismiss the complaint is denied.


SO ORDERED:

Dated:     New York, New York
           November 29, 2006

                         _____
                              Denise Cote
                         United States District Judge